**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| ARVINDER ("SONNY") KAKAR, | ) |
| | ) |
| and | ) |
| | ) |
| SEEMA KAKAR, TRUSTEE OF THE KAKAR FAMILY IRREVOCABLE TRUST U/T/A DATED DECEMBER 29, 2009 | ) ) ) ) |
| | ) |
| and | ) |
| | ) |
| SEVA HOLDINGS INC., | ) |
| | ) |
| Plaintiffs/ Counterclaim Defendants, | ) ) |
| | ) |
| v. | )　C.A. No. N22C-01-104-PRW CCLD |
| | ) |
| OCTO CONSULTING GROUP, LLC, | ) ) |
| | ) |
| Defendant/ Counterclaim Plaintiff. | ) ) |

---

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| SEVA HOLDINGS INC., | ) |
| | ) |
| Plaintiff, | ) |
| v. | )　C.A. No. 2022-0437-PRW |
| | ) |
| OCTO PLATFORM EQUITY HOLDINGS, LLC, | ) ) |
| | ) |
| Defendant. | ) |

Submitted: December 22, 2025
Decided:  March 31, 2026

**DECISION AFTER TRIAL**

Alan D. Albert, Esquire, O'HAGAN MEYER PLLC, Wilmington, Delaware; Charles M. Sims, Esquire, Rachael L. Loughlin, Esquire, and C. Quinn Adams, Esquire, O'HAGAN MEYER PLLC, Richmond, Virginia, *Attorneys for Plaintiffs/Counterclaim Defendants Seva Holdings, Inc., Arvinder Kakar, and Seems Kakar, Trustee*.

Brian C. Ralston, Esquire, and Daniel M. Rusk, IV, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Paul A. Werner, Esquire, Imad Matini, Esquire, Hannah J. Wigger, Esquire, and Maria-Laura C. Coltre, Esquire, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, Washington, District of Columbia; Kathryn J. Ryan, Esquire, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, Chicago, Illinois, *Attorneys for Defendant/Counterclaim Plaintiff Octo Consulting Group, LLC and Defendant Octo Platform Equity Holdings, LLC.*

**WALLACE, J.** [1]

---

[1] Sitting in C.A. 2022-0437-PRW by designation of the Chief Justice pursuant to *In re Designation of Actions Filed Pursuant to 8 Del. C. § 111* (Del. Feb. 23, 2023) (ORDER). *See* Ch. D.I. 51 (Chancellor's Designation Letter).

# I. INTRODUCTION

This action arises out of several agreements signed by the parties when Octo Consulting Group, LLC ("Octo Consulting"), a technology solutions provider, acquired Sevatec, founded by Arvinder Kakar. Octo Platform Equity Holdings, LLC ("Octo Platform") is Octo Consulting's parent (collectively, the "Octo Parties"). Sevatec was a technology services firm that worked with several federal government agencies. Octo Consulting purchased Sevatec through Stock Purchase Agreement (the "SPA"). Additionally, at Closing, Mr. Kakar signed an Additional Payments Agreement ("APA"), Employment Agreement ("EA"), Operating Agreement ("OA"), a Side Letter Agreement, and a Non-Competition Agreement ("NCA"). Through these contracts, Mr. Kakar continued his professional relationship with the Octo Parties. But things went South and eventually led to these consolidated multi-court suits.

After Closing, the Octo Parties removed the Sevatec name from the purchased LLC that Mr. Kakar had founded. Thereafter, the parties' relationship soured, and Mr. Kakar no longer wanted to be a part of the new entity. This led to him breaching the EA by neglecting his professional duties and acting unprofessionally toward Octo members and employees. Mr. Kakar also breached his Non-Competition Agreement by publicly filing his complaint in the Superior Court action.

Both the Octo and Kakar Parties breached the SPA after closing and failed to

correctly follow their contractually agreed-upon processes and duties. That said, most of the Octo Parties' counterclaims falter because the deal simply didn't quite turn out as hoped—not due to any legal wrongdoing by Sevatec or Mr. Kakar—or because proof of damages is lacking. Lastly, Octo Platform properly repurchased Seva's shares after Mr. Kakar's termination and, therefore, didn't breach the OA or the Side Letter Agreement.

## II. THE TRIAL

Trial took place over five days, during which the Court heard the in-person testimony of:

| | |
|---|---|
| Ned Barnes | Michael Lustbader |
| Rebecca Cohencious | Valerie Jeanne Lyons |
| Jeffrey Cook | Michael Koltonyuk |
| Sujey Edward | Mehul Sanghani |
| Megan Gifford | Jiten Shah |
| Arvinder Kakar | |

The record consists of over 100 exhibits, deposition transcripts, and live testimony from fact witnesses and expert witnesses, as well as the facts stipulated to by the parties.[2] Now, the Court determines the parties' liabilities and the appropriate damages, if any.[3]

---

[2] This decision cites to: trial exhibits (by "JX, DX, or PX" number); the trial transcript ("[AM/PM for 9/9 Tr.] [Date of Trial] [Last Name] Tr."); admitted deposition transcripts ([Last Name] Tr."); and stipulated facts set forth in the Pre-Trial Order ("PTO") (Super. Ct. D.I. 136).

[3] In addition to the trial evidence and arguments made by counsel, the Court also now has the benefit of the parties' post-trial briefing. Super. Ct. D.I. 159, 160, 166, and 168.

## III. APPLICABLE LEGAL PRINCIPLES AND STANDARDS

The Court has examined all exhibits submitted by the parties and considered the testimony of all witnesses, both direct and cross, live and by deposition. During trial, the Court applied the Delaware Rules of Evidence to the testimony and the exhibits presented. Consistent with the Court's knowledge of those rules and the specific rulings the Court articulated during both pre-trial and trial proceedings, the Court has relied only on the evidence allowed under those rules and rulings in reaching its verdict.

As this was a bench trial, the Court is the sole finder of fact.[4] In turn, the Court has made its own assessment of each witness's credibility and reconciled, to the best of its ability, any inconsistencies in the testimony and documentary evidence.[5] The Court then reviewed and applied the same instructions that it would give a jury in these circumstances.[6]

The Court has remained mindful throughout its deliberations that the party

---

[4] *Pouls v. Windmill Ests., LLC*, 2010 WL 2348648, at *4 (Del. Super. Ct. June 10, 2010).

[5] *Pencader Assoc., LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *3 (Del. Super. Ct. June 30, 2010) ("[I]n a bench trial, it is the Court's role to resolve the conflicts in witnesses' testimony and weigh their credibility."); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545-46 (Del. Super. Ct. 2005) (setting forth "the customary Delaware standard" a trial judge applies when assessing trial testimony and evidence in a bench trial).

[6] *See, e.g.*, Del. Super. Ct. Civ. Pattern Jury Instr. 4.1 (Burden of Proof by a Preponderance of the Evidence) (2025); *id.* at 4.2 (Evidence Equally Balanced); *id.* at 23.1 (Evidence—Direct or Circumstantial); *id.* at 23.9 (Credibility of Witnesses—Weighing Conflicting Testimony); *id.* at 23.10 (Expert Testimony).

seeking judgment and relief on its pled claim or counterclaim must prove each element thereof by a preponderance of the evidence.[7]

In reaching its verdict, the Court has considered all applicable law and each party's respective arguments—both oral and written—on the merits of the parties' claims, defenses, and the weight to be accorded to witness testimony and other forms of evidence submitted.[8]

## IV. FINDINGS OF FACT[9]

It is difficult at times in the trial of certain actions to fully and cleanly segregate findings of fact from conclusions of law. To the extent any one of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that

---

[7] *Pouls*, 2010 WL 2348648, at \*4; *Surf's Up Legacy Pr's, LLC v. Virgin Fest, LLC*, 2024 WL 1596021, at \*15 (Del. Super. Ct. Apr. 12, 2024), *reargument denied*, 2024 WL 3273427 (Del. Super. Ct. July 2, 2024) ("A party must prove each element by a preponderance of the evidence."). *See Grand Acquisition, LLC v. Passco Indian Springs DST*, 145 A.3d 990, 994 (Del. Ch. 2016), *as revised* (Sept. 7, 2016), *aff'd*, 158 A.3d 449 (Del. 2017) (explicating the preponderance of evidence standard); *see also Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence: "The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists."); *Newark Shopping Ctr. Owner, L.L.C. v. Saudades Grp., LLC*, 2025 WL 655063, at \*3 (Del. Super. Ct. Feb. 26, 2025) (same).

[8] The Court may highlight certain facts and legal principles uniquely applicable to this case. But the fact that a certain principle is expressly mentioned here does not indicate that the Court did not consider other legal principles applicable to this case and to the parties' claims and defenses during its deliberations.

[9] The following facts were stipulated by the parties or proven by a preponderance of the evidence at trial.

point.[10]

## A. THE PARTIES

Mr. Kakar formed Sevatec, Inc. in 2003.[11] Mr. Kakar served as Sevatec's CEO until December 11, 2020.[12] Before the Sevatec Acquisition, Mr. Kakar and Seema Kakar, Trustee of the Kakar Family Irrevocable Trust U/T/A Dated December 29, 2009 (hereinafter "The Kakar Trust"), owned Sevatec's shares.[13] As part of the Sevatec Acquisition, Mr. Kakar and Trustee formed Seva Holdings Inc. ("Seva"), a Delaware Corporation, to hold the membership interests of Octo Platform that were issued to them as part of the Sevatec Acquisition.[14]

Octo Platform is the parent company of Octo Consulting,[15] and is a Delaware limited liability company.[16] Octo Consulting's CEO was Mehul Sanghani and Octo Platform's Board Chairman is Michael Lustbader.[17] Mr. Sanghani founded Octo Consulting in 2006.[18] Octo Consulting Group is a Virginia limited liability

---

[10] *See Facchina Constr. Litigs.*, 2020 WL 6363678, at *2 n.12 (Del. Super. Ct. Oct. 29, 2020) (collecting authority).

[11] 9/8 Kakar Tr. 96.

[12] *Id.*

[13] *Id.* at 99, 182–83. Ms. Kakar will be referred to as "Trustee."

[14] *Id.* at 100–01.

[15] *Id.* at 96–97.

[16] JX 56 [hereinafter "SPA"] at 1; JX 63 [hereinafter "OA"] at 1.

[17] AM 9/9 Sanghani Tr. 95; 9/10 Lustbader Tr. 37, 63.

[18] AM 9/9 Sanghani Tr. 95.

company.[19]

## B. THE SEVATEC ACQUISITION

In December 2020, Octo Consulting acquired Sevatec from Mr. Kakar and his affiliated family entities (collectively, the "Kakar Parties").[20]  As part of the transaction, Sevatec, Inc. was converted to Sevatec, LLC.[21]  And the parties executed several agreements to consummate the deal (the "Transaction Agreements").

## C. THE STOCK PURCHASE AGREEMENT

The parties entered into the Stock Purchase Agreement ("SPA") for the acquisition of Sevatec by Octo Platform.[22]  As part of the Sevatec Acquisition, Seva was granted $30 million in Membership Units, consisting 14,400 Membership Units of Preferred B Equity and 259,007 Membership Units of Common equity in Octo Platform pursuant to a Rollover and Subscription Agreement dated November 30, 2020 ("R&S Agreement"), between Octo Platform, Mr. Kakar and The Kakar Trust.[23]  At Mr. Kakar's direction, a portion of the Membership Units issued to Seva were issued to certain legacy Sevatec employees.[24] This left Seva with 246,276.0873 units of Common Membership Units and 13,692.1927 units of Preferred B

---

[19]  SPA at 1.

[20]  9/8 Kakar Tr. 96–97; 9/8 Cohencious Tr. 10.

[21]  SPA at 1.

[22]  *See generally* SPA.

[23]  PTO ¶ F.

[24]  *Id*. at ¶ G.

Membership Units in Octo Platform (collectively, the Common Membership Units and the Preferred B Membership Units are referred to as "Membership Units").[25] The Sevatec Acquisition closed on December 11, 2020.[26]

The Kakar Trust, along with Mr. Kakar, are identified as "Shareholders" under the SPA.[27] The SPA identifies Seva as "Newco."[28]

### 1. The Purchase Price Adjustment Process

SPA Section 1.3 provides for the Purchase Price Adjustment Process.[29] Under that process, at Closing, $1.5 million of the purchase price was placed in escrow ("Adjustment Escrow") pending the preparation of a Post Closing Statement.[30] After that, Sevatec had to prepare and deliver—in good faith—a Preliminary Closing Statement for Octo.[31] Then, within 90 days after the Closing Date, Octo Consulting had to cause Sevatec to prepare and deliver the Proposed Closing Statement to Mr. Kakar.[32] And, unless Mr. Kakar notified Octo Consulting in writing that he disagreed with the Proposed Closing Statement within 45 days of receipt ("Objection

---

[25] *Id.*

[26] PTO ¶ E.

[27] *See* SPA at 1 and Signature Page.

[28] *See* SPA at 1.

[29] *See generally id.* at § 1.3.

[30] *Id.* at § 1.2(c).

[31] *Id.* at § 1.3(a)(i).

[32] *Id.* at § 1.3(b)(i).

Notice"), the Proposed Closing Statement became final and binding on the parties.[33] The Objection Notice triggers commercially reasonable efforts to resolve the dispute or, if that fails, submission to an independent accounting firm for resolution.[34] Thus, the Proposed Closing Statement became final and binding upon: (1) acceptance by Mr. Kakar; (2) as agreed upon by Octo Consulting and Mr. Kakar; or (3) as determined by the independent accounting firm.[35] After becoming final and binding, the Proposed Closing Statement "shall" be used to finally determine the Finally Determined Adjustment Amount.[36] If the Finally Determined Adjustment Amount was greater than the Estimated Adjustment Amount, Octo had to deliver joint written instructions to the escrow agent for the escrow agent to deliver the Adjustment Escrow Amount.[37]

On March 11, 2021, Octo Consulting's FCO, Jeffrey Cook, provided Mr. Kakar with a preliminary closing net working capital calculation of $199,000.[38] At the Octo Parties' request, Mr. Kakar agreed to a brief extension of the 90-day deadline to deliver the Proposed Closing Statement to Mr. Kakar.[39] Then, on April

---

[33] *Id.* at § 1.3(b)(iii).

[34] *Id.*

[35] *Id.* at § 1.3(b)(iv).

[36] *Id.*

[37] SPA § 1.3(c).

[38] 9/8 Kakar Tr. 134–35; 9/11 Cook Tr. 83; DX 147.

[39] 9/8 Kakar Tr. 141–43.

21, 2021, Mr. Cook sent the Proposed Closing Statement—with a closing net working capital calculation of $233,535.39—to Mr. Kakar.[40] That same day, Mr. Kakar told Mr. Cook that he agreed with that number.[41] Later, on May 4, 2021, Octo Consulting asserted that certain payments related to the FITSS program should be deducted from the previous calculation given to Mr. Kakar.[42] Eventually, on December 3, 2021, Mr. Kakar, through counsel, demanded that Octo Consulting pay the net working capital calculation of $233,535.39 and release the Adjustment Escrow.[43] Octo Consulting refused.[44]

### 2. Sevatec's Representations

Sevatec made several representations in SPA Section 3.[45] Relevant to Octo Consulting's counterclaims is SPA Section 3.18(c), which represents that Sevatec was in compliance with all "terms and conditions" of its existing government contracts and bids as of November 30, 2020.[46] Before Closing, Sevatec bid a solution relating to the Contract Acquisition Lifecycle Management ("CALM")

---

[40] DX 215; 9/11 Cook Tr. 86–87.

[41] 9/8 Kakar Tr. 148–49.

[42] PX 242; 9/8 Kakar Tr. 141–42.

[43] JX 343.

[44] 9/8 Kakar. Tr. 147.

[45] *See generally* SPA § 3.

[46] *See id.* at § 3.18(c)(i).

Project that ultimately did not meet the contract's requirements.[47]

### 3. The Indemnification Procedure

The parties placed $1.025 million of the purchase price into escrow ("Indemnification Escrow").[48] Absent a claim against Sevatec under SPA Section 9.2 in the 12 months following Closing, Octo Consulting was to direct the escrow agent to release $512,500 of the Indemnification Escrow to Plaintiffs on the one-year anniversary of Closing.[49] Then, absent an indemnity claim from Octo Consulting in the next six months, the remaining $512,500 was to be released from the Indemnification Escrow 18 months after Closing.[50]

The SPA has an indemnification section relating to certain breaches.[51] The Claim Procedure says that the Indemnified Party "shall" give written notice of any claim and required Octo to cause Sevatec to make available to Mr. Kakar non-privileged books, records, and personnel for Mr. Kakar to evaluate any claim.[52] SPA Section 9 further states that the indemnification provisions "shall be the sole and exclusive remedies for breaches of the representations and warranties contained in

---

[47] 9/10 Shah Tr. 179–80.

[48] SPA § 1.2(c).

[49] *Id*. at § 9.11(a).

[50] *Id*.

[51] *See generally id.* at § 9.

[52] *Id*. at § 9.4.

[the SPA]."[53]

On December 10, 2021, Octo Consulting asserted a claim against Sevatec for indemnification under SPA Section 9.2(a) for: (1) Sevatec's alleged breach of the representations and warranties in SPA Sections 3.18(c)(i) and (iii) relating to Octo Consulting's failure to achieve authorization to operate ("ATO") within 100 days of the October 27, 2020, start date of CALM; and (2) for an alleged Indebtedness pursuant to SPA Section 9.4 based on Sevatec's purported failure to pay the FITSS Payments.[54]  On June 9, 2022, Octo Consulting asserted another indemnification claim against Seva based on Seva's alleged failure to pay certain post-closing retention payments of $260,000, purportedly owed under SPA Section 8.6(e).[55]  The Octo Parties haven't released any of the Indemnification Escrow funds.[56]

### 4. Other SPA Payment Obligations

The SPA required the Kakar Parties to pay Octo Consulting $260,000 in the form of the "Post-Closing Retention Bonus" to legacy Sevatec personnel and, separately, to pay any "Indebtedness" not discharged before Closing.[57]  After Closing, Octo Consulting paid $65,000 in bonuses to eligible employees relating to

---

[53]  *Id*. at § 9.9.

[54]  JX 347; 9/8 Kakar Tr. 152.

[55]  DX 373.

[56]  9/8 Kakar Tr. 150–51.

[57]  SPA §§ 8.6(e) and 9.2.

the FITSS recompete contract.[58]  The Kakar Parties didn't pay the Post-Closing Retention Bonuses or the FITSS recompete bonuses to Octo Consulting.

## D. ADDITIONAL PAYMENTS AGREEMENT

Mr. Kakar stood to earn additional compensation under the Additional Payments Agreement ("APA") if certain legacy Sevatec accounts were renewed or achieved certain growth and profitability metrics.[59]  Mr. Kakar, Trustee, and Octo Consulting entered into the APA on November 30, 2020.[60]  APA Schedule A listed existing Government Contract programs ("Recompete Programs") for which Mr. Kakar could earn additional compensation ("Recompete Payment") based on the re-award of three or more of those contracts ("Recompete Contracts").[61]  To earn a Recompete Payment, Mr. Kakar had to either:  (1) win three contracts listed in Schedule A of the APA whose pricing exceeded 80% of the Gross Profit Before Fringe ("GPBF") set forth in Schedule A; (2) win one or two contracts listed in Schedule A of the APA whose pricing exceeded 80% of the GPBF set forth in Schedule A if none of the contracts fell below 60% of the GPBF and the sum of the contracts exceeded the 80% GPBF threshold; or (3) win two contracts listed in

---

[58]  9/11 Cook Tr. 50–51; DX 288.

[59]  JX 57 [hereinafter "APA"].

[60]  PTO ¶ L.

[61]  APA §§ 1(a)–(f).

Schedule A of the APA whose GPBF together exceed $11 million.[62]

After agreeing to the APA, Octo Consulting won recompetes for the following agreements:

- DOT FHWA SWES ("SWES") (successor to FITSS II);

- DBIS III under the Alliant 2 contracting vehicle ("DBIS III Alliant 2") (successor to DBIS Eagle 2); and

- ICAM under the Alliant 2 contracting vehicle ("ICAM Alliant 2") (successor to ICAM Eagle 2).[63]

Rebecca Cohencious, Octo Consulting's Pricing Director, developed pricing bids when Octo Consulting obtained a government solicitation for new work.[64]  Upon Mr. Kakar's request, Ms. Cohencious calculated the GPBF of these recompetes.[65]

### E. THE OPERATING AGREEMENT REPURCHASE PROCESS AND OCTO PLATFORM'S PURPORTED REPURCHASE

Also, in relation to Closing, the parties executed the Operating Agreement ("OA"), which is the operative agreement during the period of December 11, 2020, through the present.[66]  OA Section 8.1(a) says:

Any purported Transfer in violation of this Agreement shall be null and void *ab initio* and [Octo Platform] shall not recognize any such Transfer or accord to any purported transferee any rights as a Member of [Octo

---

[62]  *Id*. at §§ 1(a)–(f).

[63]  JX 390; 9/8 Kakar Tr. 171–72; 9/8 Cohencious Tr. 13–18, 29, 34, 47, 86–88.

[64]  9/8 Cohencious Tr. 11–12.

[65]  *Id*. at 78; JX 390.

[66]  PTO ¶ N.

- 13 -

Platform].[67]

Additionally, the OA lays out a repurchase process. First, there must be a Triggering Event.[68] The Court held at summary judgment that a Triggering Event occurred.[69] Then, OA Section 8.7(d) sets out that, after the pricing calculation, Octo Platform is to deliver a "Repurchase Note for the balance of the Repurchase Price;"[70] the "Repurchase Price shall be paid against the delivery of the certificates or other instruments" of the membership interests.[71] Octo Platform is entitled to "receive customary representations and warranties" with respect to "any securities purchased."[72] If Seva fails to comply with the obligations under Section 8.7, Octo Platform "may thereupon place an amount of, equal to the amount of the purchase price to be paid . . . in escrow . . . whereupon [Octo Platform] shall be entitled to cancel . . . and treat" the membership interests "as having been purchased."[73]

Octo Platform notified Seva of its intent to repurchase Seva's Units, consisting of 13,692.1927 Preferred B Equity and 246,276.0873 Common Equity

---

[67] OA § 8.1(a).

[68] *Id*.

[69] *Seva Holdings Inc. v. Octo Platform Equity Holdings, LLC*, 2024 WL 3982187, at *8 (Del. Ch. Aug. 29, 2024) (*Seva Holdings I*).

[70] OA § 8.7(d)(i).

[71] *Id*. at § 8.7(d)(ii).

[72] *Id*. at § 8.7(d)(iii).

[73] *Id*.

units (together, the "Units") on February 14, 2022 ("Notice").[74] The Notice attached a Unit Repurchase Agreement ("URA"), which included a general release of claims, and an unexecuted Subordinated Promissory Note.[75] Seva disputed Octo Platform's right to purchase its Units and threatened litigation if Octo Platform proceeded with the repurchase.[76] Seva also "dispute[ed]" that it "must sign the [URA]" because it contained "onerous terms" that expanded Octo Platform's rights under the OA and were "nowhere found" in the OA.[77] On April 15, 2021, Mr. Lustbader directed Michael Koltonyuk, lead deal counsel for the Octo Parties,[78] to close on the repurchase of Seva's Units and apply Mr. Lustbader's electronic signature to the promissory note.[79] Seva didn't appear at the Closing.[80] And Octo Platform placed the note in escrow on that same day with Mr. Koltonyuk.[81]

Also on the same day, Mr. Koltonyuk informed Seva that Octo Platform was treating Seva's Units as repurchased and cancelled (the "Repurchase Letter").[82] The Repurchase Letter stated that given Seva's "fail[ure] to deliver a countersigned copy

---

[74]  9/8 Kakar Tr. 181; JX 358.

[75]  JX 358.

[76]  9/8 Kakar Tr. 184, 187; JX 361.

[77]  JX 361; AM 9/9 Kakar Tr. 32.

[78]  9/10 Koltonyuk Tr. 93.

[79]  *Id*. at 30–31, 111.

[80]  *Id*. at 30, 110.

[81]  JX 366; DX 367.

[82]  *Id*.

of the [URA]," containing the release, Octo Platform was cancelling Seva's Units.[83]

### F. THE LETTER AGREEMENT AND OCTO PLATFORM'S LEGACY SEVA REPURCHASE

On December 11, 2020, Seva and Octo Platform executed a Letter Agreement re: Assignment of certain repurchase rights, grant of board rights, modification of repurchase and other rights ("Side Letter Agreement").[84] Under the Side Letter Agreement, Seva retained a right to repurchase certain Repurchase Options "only if [Seva] [wa]s a Member of [Octo Platform] at the time such Repurchase Option" arose.[85] Side Letter Agreement Schedule 1 lists twenty two Members to which the right to repurchase applies.[86]

After Octo Platform's purported repurchase and cancellation of Seva's shares, Octo Platform repurchased the units of several legacy Sevatec employees. These employees include:

- Lisa Spory
- Smriti Nidhi Kesava
- Eric VamAmburg
- Jennifer Whitlow
- Aaron Lavigne
- John Hughes
- Ramin Rad[87]

---

[83]  JX 366.

[84]  PTO ¶ K.

[85]  JX 65 [hereinafter "Side Letter Agreement"] § 1.

[86]  Side Letter Agreement Schedule 1.

[87]  9/8 Kakar Tr. 198–204; PX 290; PX 413.

These employees are listed in Side Letter Agreement Schedule 1.[88]  Octo Platform didn't provide notice of the legacy Sevatec employee unit repurchases to Seva or Mr. Kakar.[89]

## G. THE EMPLOYMENT AGREEMENT AND NON-COMPETITION AGREEMENT

Following Sevatec's acquisition, Mr. Kakar became Octo Consulting's Head of Strategy and Vice Chair of the Board through the Executive Employment Agreement ("EA").[90]  Mr. Kakar and Octo Consulting executed the EA on November 30, 2020.[91]  The EA provides that Mr. Kakar's "duties and responsibilities" were "commensurate" with his title, and he agreed to perform them "with fidelity and loyalty" to Octo Consulting and to the best of his "ability, experience, and talent in a diligent, trustworthy, businesslike, and efficient manner."[92]

Similarly, on the same day, Mr. Kakar signed the Non-Competition Agreement ("NCA"), which became effective at Closing.[93]  Under the NCA, Mr. Kakar was prohibited from "directly or indirectly" revealing, reporting, publishing,

---

[88]  *See* Side Letter Agreement Schedule 1.

[89]  9/8 Kakar Tr. 198–204.

[90]  JX 54 [hereinafter "EA"]; 9/8 Kakar Tr. 111.

[91]  PTO ¶ I.

[92]  EA § 3.

[93]  DX 52 [hereinafter "NCA"] at 1; PTO ¶ J.

disclosing, or transferring any Octo Confidential Information.[94] Confidential Information, under the NCA, includes "any information concerning the Company's or its Subsidiaries' affairs or assets that is not generally available to the public."[95] And the NCA required Mr. Kakar to not, directly or indirectly, "encourage, induce, attempt to induce, solicit or attempt to solicit any Covered Personnel to leave the service (whether as an employee, consultant or independent contractor) of the Company or its Subsidiaries."[96]

## H. THE POST-CLOSING FALLOUT

After Closing, Mr. Kakar directed several demands to the Octo Parties.[97] The Octo Parties allowed Mr. Kakar to hire a personal assistant and undertook a branding study to evaluate the name of the company.[98] Octo Consulting's Board hired a third-party marketing firm to conduct the branding study and present the results to the Board for further consideration.[99] Based on the results of that branding assessment,

---

[94] NCA § 3.4.

[95] *Id*. at § 2.1.

[96] *Id*. at § 3.1.

[97] Mr. Kakar demanded that Octo lease office space owned by the Kakar Parties, even though Octo had no need for the space at all, let alone amid a global pandemic that had everyone working from home. DX 143; DX 181; 9/8 Kakar Tr. 238–40, 264–65; AM 9/9 Sanghani Tr. 39–40, 53–54; 9/10 Lustbader 15–16. Mr. Kakar also repeatedly demanded that Octo incorporate "Sevatec" into the name of the combined company and hire his personal assistant, Carol Barbosa. 9/8 Kakar Tr. 219–25, 236–237; AM 9/9 Kakar Tr. 6; AM 9/9 Sanghani Tr. 72–74; DX 143; DX 181; DX 97; DX 391

[98] AM 9/9 Kakar Tr. 6–7; AM 9/9 Sanghani Tr. 72–74, 31–35; 9/8 Kakar Tr. 220–21; 9/10 Lustbadder Tr. 9–10.

[99] 9/8 Kakar Tr. 222; AM 9/9 Sanghani Tr. 34–35; 9/10 Lustbader Tr. 10–11; 9/11 Lyons Tr. 166.

the Board retained Octo as the go-forward name.[100]  Octo Consulting also declined to lease additional space it did not need from the Kakar Parties.[101]

The Board's decisions changed the dynamic between Mr. Kakar and the Octo Parties.[102]  Mr. Kakar largely disengaged from his leadership role and refused to participate in integration events, calls, meetings, and functions.[103]  Other Octo members had to step up to make up for Mr. Kakar's inactions.[104]

Several weeks after the deal closed, Octo Consulting received a Letter of Concern about the CALM Project stating that it was "failing to meet the government contractually mandated milestone."[105]  After receiving the Letter of Concern, Octo discovered the solution Sevatec had earlier bid could not meet the contract's requirements.[106]

At one meeting, Mr. Kakar accused Mr. Lustbader of having a "deceitful and dishonest" nature, cursed and swore at Mr. Lustbader and Mr. Sanghani, and gave them a double middle finger gesture before storming off and peeling away in his

---

[100]  9/8 Kakar Tr. 223–224; AM 9/9 Sanghani Tr. 31–36; 9/10 Lustbader Tr. 11; 9/11 Lyons Tr. 167.

[101]  PM 9/9 Sanghani Tr. 54; 9/10 Lustbader Tr. 16–17.

[102]  9/8 Kakar Tr. 242–45.

[103]  DX 163; DX 164; DX 204; DX 257; DX 268; AM 9/9 Sanghani Tr. 59; 9/10 Shah Tr. 152–56; 9/11 Gifford Tr. 139–141.

[104]  AM 9/9 Sanghani Tr. 31, 59–67; 9/10 Shah Tr. 152, 175–76; 9/11 Cook Tr. 45–46; 9/11 Lyons Tr. 169–73; 9/11 Gifford Tr. 141–44, 146–47.

[105]  DX 149.

[106]  9/10 Shah Tr. 179–80.

Ferrari.[107]  At another meeting with Mr. Lustbader at a Maryland coffee shop, Mr. Kakar made a public scene, slamming his hands down on the table and telling Mr. Lustbader he felt like punching him in the face.[108]  After all this, the Board issued Mr. Kakar a Notice of Material Breaches and Willful Misconduct detailing his violations of his contractual obligations and provided Mr. Kakar an opportunity to meet with the Board.[109]  Mr. Kakar didn't meet with the Board and resigned as an employee and Board member.[110]  The day after his resignation, Mr. Kakar filed a series of public lawsuits against the Octo Parties and its executives in multiple jurisdictions.[111]

## V. THIS LITIGATION AND THE PARTIES' CONTENTIONS

This litigation invokes both the Court of Chancery's jurisdiction and the Superior Court's.

In the Chancery action, Seva's remaining claims are:  (1) a declaratory judgment that Octo Platform's purported repurchase of Seva's Membership Units is void because it wasn't undertaken in conformity with the OA; (2) breach of the OA; (3) breach of the Side Letter Agreement; (4) a constructive trust; and (5) injunctive

---

[107]  AM 9/9 Sanghani Tr. 46–50.

[108]  9/10 Lustbader Tr. 20–21.

[109]  DX 316.

[110]  9/10 Lustbader Tr. 24; DX 354.

[111]  9/10 Lustbader Tr. 25–26; *see generally* Super. Ct. Compl. (Super. Ct. D.I. 1).

relief.[112]  There are no counterclaims in the Court of Chancery litigation.

In the Superior Court action, the Kakar Parties' remaining claims are: (1) breach of the APA; (2) breach of the SPA; and (3) a declaratory judgment that the Octo Parties' material breach of the Transaction Agreements excuses the Kakar Parties' obligations under the EA and NCA or, alternatively, that those agreements are unenforceable.[113]  And the Octo Parties respond in Superior Court with counterclaims of:  (1) breach of the EA against Mr. Kakar; (2) breach of the NCA against Mr. Kakar; (3) breach of the SPA against the Kakar Parties; (4) unjust enrichment against the Kakar Parties; and (5) a declaratory judgment that the Kakar Parties materially breached the EA, NCA, and SPA.[114]

The Court held a joint trial on all these remaining claims from September 8 to 12, 2025.  And the parties timely completed their post-trial briefing.

## VI. ANALYSIS AND FINDINGS

The parties' dispute arises from the contracts among them and the asserted breaches of said agreements.  A breach of contract requires (1) a contractual

---

[112] *See generally* Ch. Compl.; *Seva Holdings I*, 2024 WL 3982187, at *12 (granting summary judgment to Octo on Counts I and III of Ch. Compl.).

[113] *See generally* Super. Ct. Compl.; Super Ct. D.I. 24 (Order) (stipulating to dismissal of Count I of Super Ct. Compl.); Super Ct. D.I. 132 (Order) (stipulating to dismissal of Counts II and V of Super. Ct. Compl.).

[114] *See generally* Super Ct. Countercl. (Super Ct. D.I. 33).

obligation, (2) a breach of that obligation, and (3) resulting damages.[115]  The Court will read a contract as a whole and will give each provision and term effect, so as not to render any part of it mere surplusage.[116]  The Court will give effect to the plain meaning of the clear and unambiguous terms and provisions of a contract.[117]  When the contractual language is clear, the Court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[118] Now, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[119]  And if there is ambiguity, then the Court "may consider extrinsic evidence to resolve the ambiguity."[120]

One championing a breach-of-contract claim must establish each of its elements by a preponderance of the evidence.[121]

---

[115] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005).

[116] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citations omitted).

[117] *Id*.

[118] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

[119] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[120] *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014).

[121] *See Facchina Constr. Litigs.*, 2020 WL 6363678, at *14 (defining burden of proof in trial of such claims and counterclaims) (citing *Reynolds*, 237 A.2d at 711 (defining preponderance of the evidence); *Oberly v. Howard Hughes Med. Inst.*, 472 A.2d 366, 390 (Del. Ch. 1984)); *Dieckman v. Regency GP LP*, 2021 WL 537325, at *18 (Del. Ch. Feb. 15, 2021).

The Court begins with its analysis of Seva's Court of Chancery claims. The Court finds that Seva's claims fail since Octo Platform properly repurchased Seva's Membership Units and, subsequently, didn't breach the Side Letter Agreement.

Turning to the Superior Court claims and counterclaims, the Court finds that Mr. Kakar failed to establish a breach of the APA by a preponderance of the evidence, both parties separately breached the SPA, and Mr. Kakar breached the EA and NCA.

## A. OCTO PLATFORM'S REPURCHASE COMPLIED WITH THE OA.

Seva seeks a declaratory judgment that Octo Platform's purported repurchase is void *ab initio* because Octo didn't comply with the OA's repurchase process.[122] According to Seva there are three issues with Octo Platform's repurchase: (1) Octo Platform required that Seva execute a general release before it would pay Seva the purchase price for its Units; (2) Octo Platform did not place the full amount of the purchase price in escrow as required by § 8.7(d)(iii); and (3) Octo Platform failed to establish an escrow. The Court finds that Octo Platform's repurchase was valid under the OA.

The OA's repurchase process is as follows:

- Octo Platform "shall be entitled to receive customary representations and

---

[122] Ch. Compl. ¶¶ 131–38; *See Holifield v. XRI Inv. Holdings LLC*, 304 A.3d 896, 935 (Del. 2023) (interpreting void *ab initio* language in an LLC agreement to say that noncompliant transfers shall be void *ab initio*).

warranties" prior to any closing.[123]

- Octo Platform "shall pay" for "the Membership Interests" by offsetting them against any debts, delivering a check or wire transfer "for the amount of any cash Capital Contributions paid by such Repurchase Member," and then, to satisfy the remaining balance, "by delivery of a Repurchase Note."[124]

- If the "Repurchase Holder shall fail to appear at the closing" or fails to provide such representations and warranties, "[Octo Platform] may thereupon place an amount of, equal to the amount of the purchase price to be paid for the Membership Interests in escrow."[125]

- At that point, "[Octo Platform] shall be entitled to cancel the or other instruments representing the Membership Interests."[126]

1. **Octo Platform's request for a general release did not violate OA § 8.7(d)(iii) because Octo Platform didn't need the customary representations and warranties to repurchase.**

First, the Court doesn't find that Octo Platform's general release violated the OA. The OA provides that Octo Platform "shall be entitled to receive customary representations and warranties from the sellers of any securities purchased pursuant to this Section 8.7."[127] This provision doesn't say that Octo Platform shall receive customary representations and warranties, just that it shall be *entitled* to receive them. The OA doesn't define the term entitled or customary. If a contract doesn't

---

[123] OA § 8.7(d)(iii).

[124] *Id*. at § 8.7(d)(i).

[125] *Id*. at § 8.7(d)(iii).

[126] *Id*.

[127] *Id*.

define terms, Delaware courts look to dictionary definitions to find the plain meaning.[128] Merriam-Webster's Dictionary defines "entitled" as "having a right to certain benefits or privileges."[129] As such, Octo Platform only had a right to receive customary representations and warranties. Regardless of if a general release makes representations and warranties customary, there is nothing preventing Octo Platform from seeking a general release in addition to customary representations and warranties. Accordingly, the Court finds that Octo Platform's reading of Section 8.7(d)(iii) is more reasonable based on the plain text of the agreement.

At summary judgment the Court held that this provision was ambiguous.[130] Our Supreme Court has provided ample guidance on how to determine contractual intent:

> To determine what contractual parties intended, Delaware courts start with the text. When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions, without resort to extrinsic evidence. To aid in the interpretation of the text's meaning, Delaware adheres to the objective theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party. The contract must also be read

---

[128] *See Illinois Nat'l Ins. Co. v. Harman Int'l Indus., Inc.*, 2026 WL 204209, at *10 (Del. Jan. 27, 2026) (looking to both Merriam-Webster's Dictionary and Black's Law Dictionary to ascertain the plain meaning of undefined contract terms); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."); *see also In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020) ("This Court often looks to dictionaries to ascertain a term's plain meaning.").

[129] *Entitled*, Merriam-Webster's Dictionary (last accessed March 28, 2026), https://www.merriam-webster.com/dictionary/entitled.

[130] *Seva Holdings I*, 2024 WL 3982187, at *11.

as a whole, giving meaning to each term and avoiding an interpretation that would render any term mere surplusage. But general terms of the contract must yield to more specific terms.

If, after applying these canons of contract interpretation, the contract is nonetheless reasonably susceptible to two or more interpretations or may have two or more different meanings, then the contract is ambiguous and courts must resort to extrinsic evidence to determine the parties' contractual intent.[131]

Now with the benefit of a trial on the merits, the Court can determine which interpretation is the more reasonable one. The Court's goal as the factfinder is to effectuate the parties' intent.[132] As stated, the Court finds that Octo Platform's reading is the more reasonable one under the OA's plain terms. Although the more natural reading is to be considered,[133] the analysis does not end there, and the Court considers the extrinsic evidence submitted at trial since Seva has also put forth a reasonable interpretation.[134]

The scarce extrinsic evidence doesn't tend to show that the parties believed that a general release violated the OA. Octo Platform provided Mr. Kakar with a draft agreement for the parties to negotiate, but Mr. Kakar objected to the repurchase on the basis that a triggering event had not occurred and refused to participate in the

---

[131] *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846–47 (Del. 2019) (cleaned up).

[132] *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008).

[133] *Vill. Practice Mgmt. Co., LLC v. West*, 342 A.3d 295, 314 (Del. 2025); *BitGo Holdings, Inc. v. Galaxy Digital Holdings, Ltd.*, 319 A.3d 310, 323 (Del. 2024).

[134] *Seva Holdings I*, 2024 WL 3982187, at *11.

repurchase process.[135]  Seva didn't object to the language of the release during this time.[136]  True, evidence of post-contractual actions isn't often useful evidence when determining what the parties thought at the time of execution.  But Seva hasn't offered any compelling extrinsic evidence to show that its interpretation is the correct one and "[a]lthough contemporaneous evidence is far more probative of the shared expectations of contracting parties as a general matter, that does not mean that a party's subsequent conduct has no probative value."[137]  And it is Seva that bears the burden to prove its claim by a preponderance of the evidence.

Here, the evidence only shows that Seva didn't believe that a triggering event had occurred, not that there was any issue with the release itself.  With all that, the Court doesn't find that Octo Platform's release request violated the OA.

### 2. Octo Platform didn't have to repurchase with cash under OA § 8.7(d)(iii) since the OA provides for repurchase with a note.

Seva refused to provide any representations and warranties and didn't appear at the closing.  While OA Section 8.7(d)(i) allowed Octo Platform to repurchase by delivering and executing a promissory note to the holder, OA Section 8.7(d)(iii) kicked in when Seva refused to provide representations and warranties and failed to

---

[135]  9/10 Koltonyuk Tr. 108–110.

[136]  *Id*. at 109.

[137]  *Holzbaur v. Trolley Square Hosp., LLC*, 340 A.3d 603, 612 (Del. Ch. 2025), *aff'd sub nom. Holzbaur v. Trolley Square Hosp. Grp., LLC*, 2026 WL 261522 (Del. Feb. 2, 2026) (quotation omitted).

appear at closing. When a member fails to appear at closing or otherwise has breached its obligations under the OA, Octo Platform could still consummate the involuntary sale of the units without delivering an executed promissory note to the holder if Octo Platform placed "an amount of, equal to the amount of the purchase price to be paid for the Membership Interests in escrow."[138] Octo Platform placed the Repurchase Note in escrow.[139] Seva claims it had to escrow cash. The Court held at summary judgment that both parties had posited reasonable interpretations of the OA's closing requirements and the provision was ambiguous.[140]

The OA says "[e]very covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member."[141] Under OA Section 8.7(d)(i), Octo Platform *shall* pay for the Repurchase Options by: (1) offsetting any bona fide debts owed by the Repurchase Holder to the Company; (2) delivering to the holder of the Membership Interests a check or wire transfer of immediately available funds for the amount of any cash Capital Contributions paid by such Repurchase Member for the Membership Units or equity securities subject to the Repurchase Option (not including any proceeds from any debt offset under clause (1)) plus any principal payments made on any note

---

[138] OA § 8.7(d)(iii).

[139] 9/10 Koltonyuk Tr. 111–12.

[140] *Seva Holdings I*, 2024 WL 3982187, at *10–11.

[141] OA § 13.9.

to the Company used to purchase such Membership Units or equity, up to the balance of the Repurchase Price, if any; and (3) delivering a Repurchase Note for the balance of the Repurchase Price, if any.[142]  Conversely, OA Section 8.7(d)(iii) says:

> In the event that a Repurchase Holder shall fail to appear at the closing or shall fail to deliver the certificates or other instruments representing the Membership Interests or other equity securities to be purchased properly endorsed for transfer when required to do so, or shall otherwise fail to comply with its obligations under this Agreement, *the Company may thereupon place an amount of, equal to the amount of the purchase price to be paid for the Membership Interests in escrow for the applicable Repurchase Holder*, whereupon the Company shall be entitled to cancel the or other instruments representing the Membership Interests or other equity securities so purchased and to treat the such Membership Interests as having been purchased by Company.[143]

The Court reads OA Section 8.7(d)(iii) to provide an alternative route to repurchase if the holder doesn't want to give up its Membership Interests or doesn't comply with the OA's closing process.  In that scenario, which happened here, Octo Platform could either: (1) not repurchase the Membership Interests; or (2) place an amount equal to the purchase price *to be paid* in escrow.

Amount is defined as "the total number or quantity : AGGREGATE" and "the quantity at hand or under consideration."[144]  True, this alone might lend to a reading

---

[142]  OA § 8.7(d)(i).

[143]  *Id*. at § 8.7(d)(iii) (emphasis added).

[144]  *Amount*, Merriam-Webster's Dictionary (last accessed Mar. 28, 2026), https://www.merriam-webster.com/dictionary/amount.

that cash is required because the OA says the "amount of, equal to the amount the purchase price."[145]  But again, the Court reads agreements as a whole, giving meaning to each term and avoiding an interpretation that would render any term mere surplusage.  To complete the previous quote, OA Section 8.7(d)(iii) states that amount of, equal to the amount the purchase price *to be paid . . .* in escrow."[146]  And OA Section 8.7(d)(i) clearly says that Octo Platform *shall* pay by delivering a Repurchase Note for the balance of the Repurchase Price.[147]  The OA directs payment with a Repurchase Note and there is no clear language in the OA that overrides this requirement.  Accordingly, the Court finds that Octo Platform's interpretation, based on the OA's text, is the more reasonable one.

Looking at the extrinsic evidence, again, Seva never objected to the Repurchase Note as a form of payment when Octo Platform notified Seva that it was repurchasing and cancelling Seva's shares.[148]  Indeed, Seva didn't even raise this specific purported problem with the repurchase in its initial complaint.[149]  Seva hasn't proffered any convincing evidence showing that the parties thought, at the time of execution, that the repurchase had to be completed with cash.  Thus, Octo

---

[145]  OA § 8.7(d)(iii).

[146]  *Id.*

[147]  *Id.* at  § 8.7(d)(i) (emphasis added).

[148]  9/10 Koltonyuk Tr. 109–119.

[149]  Ch. Cmpl. ¶¶ 74–75 (Ch. D.I. 1).

Platform was allowed to repurchase the units by placing a Repurchase Note in escrow.

### 3. Octo Platform could place the Note in escrow with deal counsel.

Lastly, the Court doesn't find that a breach of the OA as a result of Octo Platform placing the executed promissory note in escrow with deal counsel—Mr. Koltonyuk—rather than a third party and without a formal escrow agreement between the parties. The OA provides that Octo Platform had to place an amount equal to the amount of the purchase price in escrow.[150] No doubt, escrow can be placed with a neutral third party that did not serve as deal counsel with a separate escrow agreement signed by both parties. But the OA doesn't mandate this.[151]

And the OA doesn't define escrow.[152] "An escrow is essentially a written instrument deposited with a third party which, by its terms, dictates a legal obligation when deposited by a grantor or depositor until the happening of some specified event or the performance of some condition whereby the written instrument will be delivered to some grantee."[153] And "[a] written promise is delivered in escrow by the promisor when he puts it into the possession of a person other than the promisee without reserving a power of revocation and manifests an intention that the

---

[150] OA § 8.7(d)(iii).

[151] *See generally* OA.

[152] *See generally id*.

[153] *Batchelor v. Alexis Properties, LLC*, 2018 WL 5919683, at *7 (Del. Super. Ct. Nov. 13, 2018).

document is to take effect according to its terms upon the occurrence of a stated condition but not otherwise."[154] The OA doesn't lay out an escrow process, and the Court will not "rewrite the contract" to create mandatory escrow requirements that are not apparent under Delaware law.[155] The OA only required Octo Platform to place the amount in escrow, not for the parties to place the amount in escrow together.[156] This is different from language in the SPA that does require a specific form of escrow process and agreement.[157] As such, there is no requirement that the parties had to jointly agree to an escrow contract or that Mr. Koltonyuk couldn't serve as an escrow agent under the OA. Once more, the Court finds that Octo Platform's interpretation is the more reasonable one based on the OA's text.

Looking again at the limited extrinsic evidence, Mr. Koltonyuk testified that it is the "default and routine" practice in corporate transactions for deal counsel to

---

[154] RESTATEMENT (SECOND) OF CONTRACTS § 103(1) (A.L.I. 1981).

[155] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[156] OA § 8.7(d)(iii).

[157] *See* SPA § 1.2(c):

> At the Closing, the Buyer shall deposit on behalf of the escrow beneficiaries in an escrow account with U.S. Bank National Association as escrow agent (the "Escrow Agent"), pursuant to the terms and conditions of an escrow agreement in the form attached hereto as Exhibit E, subject to such reasonable modifications as shall be agreed to by the Escrow Agent and the Parties thereto (the "Escrow Agreement"), by wire transfer of immediately available funds, an amount equal to (i) $1,025,000 (the "Indemnification Escrow Amount"), plus (ii) $1,500,000 (the "Adjustment Escrow Amount" and together with the Indemnification Escrow Amount, the "Escrow Amount").

hold executed documents in escrow.[158] Seva didn't object to the form of escrow in its responses to Octo Platform's notices.[159] The little extrinsic evidence again tends to show that Octo Platform could place the note in escrow with Mr. Koltonyuk.

Accordingly, the Court finds that when Seva failed to deliver customary representations and warranties or appear at closing, OA § 8.7(d)(iii) gave Octo Platform the discretion to proceed with the repurchase of Seva's Units, but only pursuant to that Section's requirements. That Section required Octo Platform to put the amount to be paid in escrow before it could cancel Seva's Units and treat them as repurchased. Octo Platform obliged. Thus, its repurchase of Seva's Units was proper and was not void *ab initio* under the OA.[160] The Court enters judgment for Octo for Chancery Counts II and IV.

## B. BECAUSE OCTO PLATFORM'S REPURCHASE IS PROPER, OCTO PLATFORM DID NOT BREACH THE SIDE LETTER AGREEMENT.

On that same note, Octo didn't breach the Side Letter Agreement since Octo Platform purchased and cancelled Seva's shares. Under the Side Letter Agreement, while it remained a member, Seva had the right to repurchase the units that Seva had transferred to the Legacy Sevatec Employees upon the termination of their Octo

---

[158] 9/10 Koltonyuk Tr. 115–16.

[159] *Id*. at 109–121.

[160] OA § 8.1(a) ("Any purported Transfer in violation of this Agreement shall be null and void ab initio and the Company shall not recognize any such Transfer or accord to any purported transferee any rights as a Member of the Company.").

Consulting employment.[161]  But as established, Octo Platform properly repurchased Seva's units and, thusly, Seva had no longer had a right to repurchase.  Accordingly, the Court enters judgment in Octo's favor on Chancery Count V.

## C. SEVA IS NOT ENTITLED TO EQUITABLE RELIEF.

Counts VI and VII of Seva's Verified Complaint seek equitable relief in the form of a constructive trust and injunctive relief.  Since Seva's Chancery claims fail, it isn't entitled to equitable relief.

International Business Machines, Inc. ("IBM") purchased Octo Platform in November 2022.[162]  As a result, the Court of Chancery issued a *Status Quo* Order that reserved certain funds in escrow relating to the IBM purchase for the purposes of this litigation.[163]  Since judgment is entered in favor of Octo Platform on all remaining Court of Chancery claims, the Court orders that Octo Platform is entitled to disburse the proceeds from the IBM Transaction, from the funds presently held in escrow pursuant to the *Status Quo* Order entered by the Court ("Reserved Funds").  Judgment is entered in Octo's favor on Chancery Counts VI and VII.

## D. MR. KAKAR HAS FAILED TO ESTABLISH A BREACH OF THE APA.

While Mr. Kakar has established that the awarded recompetes are qualifying

---

[161]  Side Letter Agreement § 1.

[162]  PX 380.

[163]  Ch. D.I. 41 (Order).

Recompete Contracts, he has not established that the Recompete Contracts met the GPBF threshold. Octo contends that ICAM Alliant 2 is a "bridge" rather than a "recompete" because it was "issued on a sole-source basis" as a "stop-gap" while the government "put together its recompete process."[164] But there is nothing in the APA that requires there to be a competitive recompete process for a contract award to qualify as a Recompete Contract under the APA.[165] Thus, SWES, DBIS III Alliant 2, and ICAM Alliant 2 are all qualifying Recompete Contracts.

That said, the Court does not find that Mr. Kakar has demonstrated by a preponderance of the evidence that the Recompete Contracts met the GPBF threshold required under the APA. Mr. Kakar's primary evidence that the Recompete Contracts met the threshold is an Excel sheet prepared by Octo's former Director of Pricing Rebecca Cohencious.[166] Before entering the values into the Excel sheet, Mr. Kakar told Ms. Cohencious that the target number was $1.643 million.[167] When Ms. Cohencious first plugged the values into the Octo pricing program, she did not reach $1.643 million.[168] With the required and optional Contract Line Item Numbers ("CLINs") inputted into the calculation,

---

[164] Octo Br. ¶¶ 79–80.

[165] *See generally* APA §§ 1(a)–(f).

[166] JX 390.

[167] Cohencious Tr. 78.

[168] *Id*. at 77–78.

Ms. Cohencious' calculation fell short of Mr. Kakar's target.[169]  To reach $1.643

million, Ms. Cohencious added the assumption that "we worked the 70 percent of

the balance of the optional CLINs."[170]  Ms. Cohencious added this assumption to

reach the target Mr. Kakar gave her, and without that target, she would not have met

the threshold GBPF with only the default assumptions from the Octo pricing

program.  True, the APA provides for the expected GBPF numbers and is not based

on actual GBPF numbers the contracts eventually made.[171]  But even using the

correct expected GBPF, Ms. Cohencious was unsure if the threshold was met.

Indeed, Ms. Cohencious stated to Mr. Kakar:

> So overall there's no question we've met and exceeded the Target GP
> threshold in terms of total dollars.  However, there is uncertainty with
> the SWES TOs because we only meet the minimum Required GP when
> assuming that all of the priced Optional NTE values are funded in full
> in the first year and that Octo is performing 70% of those full NTE
> values.  I split out the Optional NTE values into those against which we
> made assumptions in the pricing process, and the balance of the NTE
> value.  Even when counting the Optional CLIN LOE that we assumed
> in our internal pricing models this past summer, we only get to
> $1.305M.  To meet and exceed the $1.643M requirement I've added
> the assumption that we work 70% of the balance of the Optional NTE
> CLIN values.  So I think we need the actuals and forecast data for
> 2021/2022 for these SWES TOs at this point to better understand how
> we compare to the $1.643M.  There were staffing changes within the
> required CLINs post-award, plus I don't know how much funding
> Octo's received for the Optional CLINs.[172]

---

[169] *Id*. at 77–79.

[170] *Id*. at 78; JX 390.

[171] APA § 1(b).

[172] JX 390.

Based on this, the Court finds that Mr. Kakar has failed to establish by a preponderance of the evidence that the Recompete Contracts met the expected GBPF threshold. Even Ms. Cohencious was unsure if the threshold was met, and she was only adding in assumptions to reach that number because Mr. Kakar told her that there was a target number. And there was no follow-up with Mr. Kakar and Ms. Cohencious discussing the assumptions she used or if Mr. Kakar provided her with "the actuals and forecast data for 2021/2022 for these SWES TOs at this point to better understand how we compare to the $1.643M."[173] Had she not known about the target, the Court finds that Ms. Cohencious' calculation would not have met the threshold, and this calculation is Mr. Kakar's best evidence on his earnout claim. Because of the uncertainties of Ms. Cohencious' calculation, Mr. Kakar has failed to prove a breach of the APA. Judgment is entered in favor of Defendant on Plaintiff's Superior Court Count III.

### E. BREACH OF CONTRACT UNDER THE SPA

The parties assert competing claims for breach of the SPA. The Kakar Parties assert that Octo Consulting breached the SPA by failing to pay the net working capital of $233,535.39, refusing to release the Adjustment Escrow, and refusing to

---

[173] *Id.*

release the Indemnification Escrow.[174] Octo Consulting counters that the Kakar Parties breached the SPA by breaching the representations and warranties in SPA Sections 3.18(c)(i) and (iii) with respect to CALM, failing to indemnify Octo Consulting for the FITSS Payments, and failing to indemnify Octo Consulting for additional employee retention payments in the amount of $260,000.[175]

### a. Seva has proved a breach of the Purchase Price Adjustment Process (Superior Court Complaint Count IV).

Seva insists that Octo Consulting breached the SPA by failing to order the escrow agent to pay Seva the Estimated Adjustment Amount.[176] The Court holds that Seva has demonstrated that Octo Consulting breached the SPA by failing to do so.

Again, Mr. Cook, provided Mr. Kakar with a preliminary closing net working capital calculation of $199,000.[177] At Octo Consulting's request, Mr. Kakar agreed to a brief extension of the 90-day deadline to deliver the Proposed Closing Statement.[178] Then, Mr. Cook sent the Proposed Closing Statement—with a closing net working capital calculation of $233,535.39—to Mr. Kakar.[179] That same day,

---

[174] *See generally* Super. Ct. Compl.

[175] *See generally* Super. Ct. Countercl.

[176] Super. Ct. Compl., ¶ 132 (D.I. 1).

[177] 9/8 Kakar Tr. 134–35; 9/11Cook Tr. 83; DX 147.

[178] 9/8 Kakar Tr. 141–43.

[179] DX 215; 9/11 Cook Tr. 86–87.

Mr. Kakar told Mr. Cook that he agreed with that number.[180] Later, Octo Consulting asserted that certain payments related to the FITSS program should be deducted from the previous calculation given to Mr. Kakar.[181]

Octo Consulting contends that the parties never agreed on an adjustment amount, so it was not required to instruct the escrow agent to deliver funds to Mr. Kakar from escrow. But the SPA doesn't require a bilateral acceptance by both parties. Under the SPA's Purchase Price Adjustment Process, the Proposed Closing Statement became final and binding upon: (1) acceptance by Mr. Kakar; (2) as agreed upon by Octo Consulting and Mr. Kakar; *or* (3) as determined by the independent accounting firm.[182] So under the first pathway to finality, Mr. Kakar could unilaterally accept the Proposed Closing Statement upon receipt, which he did relating to the $233,535.39 price.[183] And Octo Consulting later proposing a change to its earlier calculation, after acceptance by Mr. Kakar, doesn't revoke Mr. Kakar's valid acceptance. Moreover, continued discussions about networking capital doesn't change the fact that Mr. Kakar accepted the Proposed Closing Statement calculation delivered to him as part of the Purchase Price Adjustment Process.[184] As a result,

---

[180] 9/8 Kakar Tr. 148–49.

[181] PX 242; 9/8 Kakar Tr. 141–42.

[182] SPA § 1.3(b)(iv) (emphasis added).

[183] 9/8 Kakar Tr. 148–49.

[184] 9/11 Cook Tr. 88–89.

the Court finds that Mr. Kakar has demonstrated a breach of the SPA's Purchase Price Adjustment Process by Octo Consulting and is entitled to the Adjustment Escrow amount and the net working capital calculation amount of $233,535.39, both with prejudgment interest.[185]   Judgment is entered in the Kakar Parties' favor in Superior Court Count IV.

### b. The Indemnification Claim Procedure does not foreclose Octo Consulting's SPA Counterclaims.

Seva says that Octo Consulting can't recover under its SPA breach counterclaims because Octo Consulting didn't comply with the SPA's indemnification Claim Procedure.  Indeed, Octo Consulting neither provided Mr. Kakar SPA Section 9.4's required information nor made a claim against the Policy as required by SPA Section 9.7(d).[186]   As recently instructed by our Supreme Court, "'[f]or a condition to effect a forfeiture, it must be unambiguous.  If the language does not clearly provide for a forfeiture, then a court will construe the agreement to avoid causing one.'"[187]   There, the Court held that a specific section of a merger

---

[185] *See In re Bremerton Cellular Tel. Co. Litig.*, 328 A.3d 330, 353–54 (Del. Ch. 2024) (recognizing that prejudgment interest is awarded as a matter of right, is computed from the date payment is due, and, in the absence of an express contractual rate, is calculated using the legal rate of 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due).

[186] 9/8 Kakar Tr. 153.

[187] *Thompson St. Capital Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*, 340 A.3d 1151, 1172 (Del. 2025) (quoting *QC Holdings, Inc. v. Allconnect, Inc.*, 2018 WL 4091721, at *7 (Del. Ch. Aug. 28, 2018)).

agreement contained an express condition precedent that provided for a forfeiture upon noncompliance.[188]

The SPA contains no such clear language that gives rise to a forfeiture for noncompliance. The SPA only gives the party a procedure and provides that it is the sole and exclusive remedy for certain breaches.[189] It doesn't contain any consequences for noncompliance.[190] As a result, the Court holds that the SPA indemnification claim procedure contains no unambiguous condition precedent that requires the forfeiture by Octo Consulting for failure to comply.

### c. Octo Consulting's CALM representation breach counterclaim fails since Octo Consulting has not shown that the representation was false at Closing.

Octo Consulting claims that the Kakar Parties misrepresented the state of Contract Acquisition Lifecycle Management ("CALM") project in SPA Section 3.18(c). The Kakar Parties represented to Octo Consulting in the SPA that Sevatec was in compliance with all "terms and conditions" of its existing government projects and bids as of November 30, 2020.[191] In support of its counterclaim, Octo

---

[188] *Id.* That condition precedent read "[Sonova] shall have no right to recover any amounts pursuant to Section 9.2 unless the Purchaser notifies the Members' Representative in writing of such Claim pursuant to Section 9.3 on or before the Survival Date." *Id.*

[189] *See* SPA § 9.9.

[190] *See Thompson St. Capital Pr's*, 340 A.3d at 1174–76 (opining that the merger agreement contained a condition precedent because it defined the consequences for noncompliance).

[191] SPA § 3.18(c).

Consulting points to a post-Closing dispute over unpaid invoices for work that Unison performed under CALM.[192] But Octo Consulting's evidence of unpaid invoices only points to post-Closing unpaid invoices from 2021.[193] And Octo Consulting agrees that "[i]n entering the SPA, the Kakar Defendants represented to Octo that Sevatec was in compliance with all 'terms and conditions' of its government projects and bids *as of* November 30, 2020."[194] Sevatec only represented and warranted "as of the date of the [SPA] and as of the Closing Date."[195] Both of which pre-date any evidence of invoices that were only due after such dates. Unpaid invoices after the effective date of the SPA's representations and warranties goes beyond what was represented in that agreement.

The same goes for the letter of concern Octo Consulting received after Closing.[196] In the letter dated March 12, 2021, Kimberly Hampel informed Sevatec that the period of performance for CALM started on October 27, 2020, and as such, the 100-day period of performance ended on February 4, 2021.[197] Again, this is post-Closing, and Sevatec was still in compliance with its CALM obligations for the

---

[192] Shah Tr. 168–171; DX 115.

[193] DX 115-003 ("The items on the Jan 31 [2021] invoices which are not in dispute are now overdue.").

[194] Super Ct. Countercl., ¶ 231.

[195] SPA Art. 3.

[196] DX 149.

[197] DX 149-001.

purposes of the SPA's representations and warranties. The fact that Sevatec's proposed solution to achieve ATO within the 100-day timeline may have ultimately been unachievable doesn't mean that Sevatec was in breach at Closing. Too, Sevatec didn't represent and warrant that it would achieve all contract deliverables in the future, only that it was not in breach as of Closing. For these reasons, the Court finds that Octo Consulting failed to prove a breach of the SPA's representations and warranties.

### d. Octo Consulting's Post-Closing Retention Bonus Payment counterclaim succeeds while its Indebtedness counterclaim falls short.

According to Octo Consulting, the Kakar Parties breached the SPA by refusing to indemnify Octo Consulting for: (1) employee retention bonuses; (2) additional incentive payments related to contracts awarded after Closing; and (3) losses related to the Kakar Parties' misrepresentations about the CALM Project. As stated, there was no misrepresentation about the CALM Project. So, the Court only analyzes the retention bonuses and the additional incentive employee payments.

To start, under the SPA's Indemnifications Provision, the Kakar Parties are obligated to pay "any Indebtedness not paid and discharged in full at or prior to the Closing or not otherwise taken into account as a reduction of the Purchase Price."[198] The Indemnification Provision also catches "all obligations of [Sevatec] to make

---

[198] SPA § 9.2(c).

payments . . . with respect to the Post-Closing Retention Bonus Payments."[199] SPA Section 8.6(e) provides that Sevatec had to pay Octo $260,000, which was to be disbursed as retention bonuses to legacy Sevatec personnel 18 months after closing in May 2022.[200] This is the Post-Closing Retention Bonus Payment.[201]

With this, the Kakar Parties are on the hook for the Post-Closing Retention Bonus Payments. Octo Consulting paid this amount; Sevatec did not.[202] Thus, the Kakar Parties liable for the $260,000 Post-Closing Retention Bonus Payment Octo Consulting.

On the other hand, the SPA's Indemnification Provision does not cover the $65,000 relating to the additional incentive payment paid by Octo under the FITSS contract. The FITSS contract wasn't awarded before Closing and, likewise, wasn't discharged in full prior to Closing.[203] This doesn't fall within the SPA's Indemnification Provision and isn't recoverable by Octo Consulting. As such, judgment is entered in favor of Octo on Superior Court Counterclaim III—but only as to the Post-Closing Retention Bonus Payment.

---

[199] *Id*. at § 9.2(g).

[200] *Id*. at § 8.6(e).

[201] *Id*.

[202] 9/11 Cook Tr. 56–57; DX 373.

[203] 9/11 Cook Tr. 97–98.

### e. Octo Consulting's SPA breaches do not excuse the Kakar Parties from paying the Post-Closing Retention Bonus Payment.

While they suggest otherwise, Octo Consulting's material breach of the SPA doesn't excuse the Kakar Parties from paying the Post-Closing Retention Bonus Payment.

"A party may be excused from performing if the other party is in material breach."[204] Materiality of a breach is "determined by 'weighing the consequences in light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'"[205] This occurs when the party's failure is "so fundamental to a contract that the failure . . . defeats the essential purpose of the contract or makes it impossible for the other party to perform the contract."[206]

---

[204] *Est. of Buller v. Montague*, 2020 WL 996883, at *3 (Del. Super. Ct. Mar. 2, 2020).

[205] *Carey v. Est. of Myers*, 2015 WL 4087056, at *20 (Del. Super. Ct. July 1, 2015), *aff'd*, 132 A.3d 749 (Del. 2016) (citing *Preferred Inv. Services v. T & H Bail Bonds*, 2013 WL 3934992, at *21 (Del. Ch. July 24, 2013)).

[206] *Shore Invs., Inc. v. Bhole, Inc.*, 2011 WL 5967253, at *5 (Del. Super. Ct. Nov. 28, 2011), *amended by* 2012 WL 2337793 (Del. Super. Ct. Apr. 9, 2012), and *judgment entered*, (Del. Super. Ct. 2012), *aff'd in part, rev'd in part*, 67 A.3d 444 (Del. 2013), and *judgment entered*, (Del. Super. Ct. 2012), and *aff'd in part, rev'd in part*, 67 A.3d 444 (Del. 2013) (quoting 23 *Williston on Contracts* § 63:3 (4th ed. 2021)). "Delaware courts have adopted the factors set forth in the Restatement of Contracts to consider the materiality of a breach, including: '(a) the extent to which the injured party will be deprived of the benefit of which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all of the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.'" *Roberts v. Moffa Constr. Co. LLC*, 2024 WL 5184100, at *3 (Del. Super. Ct. Dec. 20, 2024) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 (AM. LAW INST. 1981)).

"Conversely, a slight breach by one party, while giving rise to an action for damages, does not terminate the obligations of the injured party under the contract."[207]

It is also well-settled that a party may not refuse to perform its contractual obligations after a material breach while simultaneously retaining the benefits of a contract.[208]  "'When there has been a material failure of performance by one party to a contract . . . the [other] party has the choice to continue to perform under the contract or to cease to perform, and conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform.'"[209]

Here, in response to Octo Consulting's notice of claim relating to the SPA's Indemnification Provisions, Mr. Kakar's counsel responded by imploring Octo Consulting to comply with the SPA's Indemnification Process and demanded that Octo Consulting release the Indemnification Escrow.[210]  Through this, the Kakar Parties indicated an intention to continue the contract by pressing for Octo Consulting to follow the indemnification process and for release of the escrow fund. Too, the Kakar Parties are not seeking to rescind the SPA.  So Sevatec is still

---

[207] *Est. of Myers*, 2015 WL 4087056, at *20.

[208] *Post Holdings, Inc. v. NPE Seller Rep LLC*, 2018 WL 5429833, at *5 (Del. Ch. Oct. 29, 2018).

[209] *Id*. (quoting 23 *Williston on Contracts* § 43:15 (4th ed. 2021)).

[210] PX 349.

responsible for paying the Post-Closing Retention Bonus Payment.[211]

## F. MR. KAKAR BREACHED THE EA, BUT NOT BY HIS MANAGEMENT OF THE UNISOM INVOICES.

Octo Consulting purports that Mr. Kakar's post-Closing conduct breached his EA. The Court is in some agreement with that.

The EA provides that Mr. Kakar's "duties and responsibilities" were "commensurate" with his title, and he agreed to perform them "with fidelity and loyalty" to Octo and to the best of his "ability, experience, and talent in a diligent, trustworthy, businesslike, and efficient manner."[212] Again, if a contract doesn't define terms, Delaware courts look to dictionary definitions to find the plain meaning. The EA doesn't define "commensurate."[213] Merriam-Webster's Dictionary defines commensurate as "corresponding in size, extent, amount, or degree : PROPORTINATE" and "equal in measure or extent : COEXTENSIVE."[214] Thus, the Court finds that the EA required Mr. Kakar to act in a manner corresponding in degree and equal in extent to that of a Vice Chair and Head of Strategy, and, in that capacity, act with fidelity and loyalty.

---

[211] *See Post Holdings*, 2018 WL 5429833, at *5 (holding that, by utilizing indemnification process and seeking funds in escrow, buyers indicated an intention to continue the contract).

[212] EA § 3.

[213] *See generally* EA.

[214] *Commensurate*, Merriam-Webster's Dictionary (last assessed Mar. 28, 2026), https://www.merriam-webster.com/dictionary/commensurate.

After Octo Consulting's Board decided to not go forward with the Sevatec name, Mr. Kakar operated in his role with little engagement[215] and largely abdicated his duties as a Vice Chair.[216] He refused to participate in integration events, calls, meetings, and functions.[217] Moreover, during meetings, Mr. Kakar gave a double middle finger gesture to board members and once told Mr. Lustbader that he felt like punching him.[218] This is not acting like a Vice Chair in a businesslike or efficient manner. Based on these actions during his employment, Mr. Kakar breached the EA.

That said, Mr. Kakar's decisions regarding Unisom didn't breach the EA. Octo Consulting asserts that Mr. Kakar's "draconian" stance regarding the Unison payments violated the EA because he was putting his interest in obtaining an earnout over Octo's interests and long-term business.[219] But the EA doesn't govern how Mr. Kakar had to manage contracts post-Closing. The EA says that Mr. Kakar understood that Octo Consulting's strategic plan was to build "a substantially larger organization through merger and acquisition over a period of time."[220] Obtaining

---

[215] DX 143; DX 181; 9/8 Kakar Tr. 242–43; 9/9 Sanghani Tr. 54, 71–72.

[216] 9/9 Sanghani Tr. 31, 59, 65; 9/10 Shah Tr. 152; 9/11 Cook Tr. 45–46; 9/11 Lyons Tr. 169–70, 173.

[217] DX 163; DX 164; DX 204; DX 257; DX 268; 9/9 Sanghani Tr. 59; 9/10 Shah Tr. 152, 154–56; 9/11 Gifford Tr. 139–41, 145–46.

[218] 9/9 Sanghani Tr. 46–50; 9/10 Lustbader Tr. 20–21.

[219] 9/10 Shah Tr. 171.

[220] EA § 3.

new companies through mergers and acquisitions is different from managing existing contracts. Besides assigning Mr. Kakar duties and responsibilities commensurate with Vice Chair and Head of Strategy, the EA doesn't spell out any express management duties.[221] If anything, the APA provides that former Sevatec Executive Vice President Chuck Schefer, in his capacity as head of the business unit, was in charge of these management decisions.[222] Moreover, Octo hasn't shown by a preponderance of the evidence that Mr. Kakar took his stance in relation to Unisom solely to increase his chance of earning an additional payment. Mr. Kakar disagreed with how certain payments were to be made, and this largely took place before the fallout over the merged company's name.[223] After Octo Consulting disagreed with Mr. Kakar's decisions over figuring out the Unisom payments issue, Octo

---

[221] *See* EA § 3.

[222] *See* APA § 3(a):

> Subsequent to the Closing and so long as any portion of the Additional Payment still may be earned hereunder, all of the respective businesses of the Buyer and the other Subsidiaries of the Platform Parent associated with GSA, DHS and USPTO will be managed as part of the Business under the primary direction of Mr. Schefer (for as long as Mr. Schefer remains an employee of the Platform Parent or its Subsidiaries) in his capacity as the head of the business unit of the Buyer that includes the Business and subject to such ordinary course of business internal personnel, supervision, management and control policies and procedures instituted by the Buyer's executive management with respect to the scope of authority of, and decisions of a similar nature made by, the managers in charge of the Buyer's other business units, including the review and approval of such decisions by the Buyer's Chief Financial Officer and Chief Operating Officer, subject to the Representative's authority and similar rights set forth herein and in the Employment Agreement.

[223] *Compare* DX 115's February 2021 dates *with* DX 143's and 181's dates in March 2021.

Consulting talked with Unisom and paid the invoices without Mr. Kakar.[224] The Court finds that the issue that incited Mr. Kakar's breaches was the name change, and this motivated his professional disassociation with Octo Consulting and his unprofessional conduct that breached the EA.

Octo Consulting seeks to recover wages paid to Mr. Kakar and his personal assistant during the time when Mr. Kakar shirked his duties.[225] But this isn't the proper remedy. It is well-settled Delaware law that damages for a breach of contract are expectation damages.[226] "When determining expectation damages, courts determine an amount that will give the injured party 'the benefit of its bargain by putting that party in the position it would have been but for the breach.'"[227] Unless separation was possible, Mr. Kakar still would have been paid his wage to compensate him for his work—substandard or not.

"The general measure of damages for an employee's breach of an employment contract is the additional cost, if any, incurred by the employer in obtaining a substitute performance, that is, in hiring another to perform services equivalent to those promised but not performed by the breaching employee, though additional recovery may be allowed if the additional damages were foreseeable when the

---

[224] 9/10 Shah Tr. 170–78.

[225] 9/11 Cook Tr. 46–56; DX 372; DX 391.

[226] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 695 (Del. 2019).

[227] *Id*. (citing *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000)).

parties entered the contract."[228]  "In absence of a special agreement, an employer may not recover back wages or equivalent drawings paid during the period of completed employment."[229]  The EA doesn't have a special provision providing for the return of wages.[230]  Octo Consulting hasn't provided, and the Court is unaware of, any Delaware caselaw allowing an employer to recoup wages paid to an employee after a breach of an employment contract.  As such, a return of wages paid to Mr. Kakar and his personal assistant that Octo Consulting allowed Mr. Kakar to hire isn't recoverable.

A return of wages and the alleged CALM Project and Unisom mismanagement is what Octo Consulting's expert relied on in calculating the damages owed to Octo Consulting.[231]  Yet these damages aren't due, and Octo Consulting hasn't demonstrated any other damages with the requisite certainty.[232]

---

[228]  24 *Williston on Contracts* § 66.13 (4th ed. 2025).

[229]  *Id.*; *see also Lumentum Operations LLC v. nLIGHT, Inc.*, 2024 WL 4107691, at *3 (W.D. Wash. Sept. 6, 2024) (collecting cases to say "[i]n absence of a special agreement, an employer may not recover back wages or equivalent drawings paid during the period of completed employment.").

[230]  *See* EA § 12 (providing that Octo may be entitled to injunctive relief but not for return of wages or any other specific form of damages for a breach by Mr. Kakar like liquidated damages).

[231]  9/12 Barnes 21–24; DX 288; DX 372; DX 391.

[232]  *See Winklevoss Capital Fund, LLC v. Shaw*, 2024 WL 3888757, at *9 (Del. Ch. Aug. 21, 2024):

> Plaintiffs bear the burden of proving damages.  The quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage, but the court may not award damages based on mere speculation or conjecture where a plaintiff fails adequately to prove damages.  That does not mean a party must prove damages with scientific precision. Where the amount of damages is unclear, responsible estimates of damages that lack mathematical

"Even if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages."[233] Due to the flaws in Octo Consulting's methodology, it failed to demonstrate its damages for this claim in a manner that the Court is confident it can make a responsible estimate thereof. Resultingly, the Court finds that Octo Consulting is entitled to nominal damages in the amount of one dollar for its breach-of-EA counterclaim. Judgment is entered in Octo's favor on Superior Court Counterclaim Count I.

### G. OCTO CONSULTING IS ENTITLED TO AN AWARD OF REASONABLE ATTORNEYS' FEES AND COSTS UNDER THE EA SINCE IT IS THE PREVAILING PARTY FOR THE CLAIMS MADE THEREUNDER.

Delaware law adheres to the "American Rule," which requires litigants themselves to defray the cost of being represented by counsel.[234] Litigants are responsible for paying their own counsel fees absent statutory authority or a contractual provision requiring it.[235] This general rule and its exceptions apply to actions at law, significantly limiting the Court's authority to order payment of

---

certainty are permissible so long as the court has a basis to make such a responsible estimate.

(quotations omitted).

[233] *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009) (citing *Palmer v. Moffat,* 2004 WL 397051, at *4 (Del. Super. Ct. Feb. 27, 2004)).

[234] *Duncan v. STTCPL, LLC*, 2020 WL 829374, at *15 (Del. Super. Ct. Feb. 19, 2020).

[235] *Id*.

attorney's fees.[236]

All that said, the Court will generally enforce an agreement to shift fees.[237] And absent "qualifying language that fees are to be awarded claim-by-claim or on some other partial basis, a contractual provision entitling the prevailing party to fees will usually be applied in an all-or-nothing manner."[238] In an all-or-nothing case, the Court will determine which party prevailed by analyzing which party predominated in the litigation.[239]

The EA contains a fee-shifting provision that covers EA Sections 8 and 9.[240] The fee-shifting provision says that if Octo Consulting is the prevailing party in an action to enforce those sections, Octo Consulting is "entitled to its reasonable attorneys' fee and costs incurred in such action."[241] This fee-shifting provision only applies to the prevailing party in enforcing the EA, not this entire litigation.

While Octo Consulting is successful on demonstrating a breach of the EA by Mr. Kakar for his actions after the company name-change kerfuffle, it has not shown a breach arising from the Unisom invoices or that it is entitled to a return of wages

---

[236] *Id.*

[237] *Navient Solutions, LLC v. BPG Office Partners XIII Iron Hill LLC*, 2023 WL 3120644, at *16 (Del. Super. Ct. Apr. 27, 2023).

[238] *Id.* (quoting *AFH Hldg. & Advisory, LLC v. Emmaus Life Scis., Inc.*, 2014 WL 1760935, at *2 (Del. Super. Ct. Apr. 16, 2014)).

[239] *Navient Solutions*, 2023 WL 3120644, at *16.

[240] EA § 12.

[241] *Id.*

from Mr. Kakar.[242] Mr. Kakar withdrew his claims for any Octo Consulting breaches of the EA.[243] To achieve predominance in the litigation, "a litigant should prevail on the case's chief issue."[244]

In the norm, whether a party has prevailed is determined by looking at the outcome of the substantive issues, not damages.[245] Here, while not succeeding on each sub-claim within its breach-of-contract counterclaim, Octo Consulting still has demonstrated a breach. And on the EA breach, Mr. Kakar's disassociations and professional misconduct is the chief issue. Consequently, the Court finds that Octo Consulting prevailed on its chief issue of its breach-of-EA counterclaim and is entitled to reasonable fees and costs for litigating said counterclaim.[246]

## H. OCTO CONSULTING'S UNJUST ENRICHMENT COUNTERCLAIM FAILS AS THE EA COVERS THE ACTIONS THAT GIVE RISE TO THAT COUNTERCLAIM.

Octo Consulting submits that Mr. Kakar was unjustly enriched when he and

---

[242] *See Bako Pathology LP v. Bakotic*, 288 A.3d 252, 281 (Del. 2022) (collecting cases of trial courts finding a prevailing party when party prevails on the chief issue, even when not winning on every issue at trial).

[243] Super. Ct. D.I. 133.

[244] *2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at *33 (Del. Ch. Oct. 14, 2015) (internal quotation omitted).

[245] *Winklevoss Capital Fund*, 2024 WL 3888757, at *21; *see also Ivize of Milwaukee*, 2009 WL 1111179, at *14 (finding that although the plaintiff "did not prove its damages with the required certainty, it did" prove breach of contract and so it prevailed in the substance of the litigation).

[246] *See Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2025 WL 3232923, at *7 (Del. Super. Ct. Nov. 19, 2025) ("Put another way, a fee-shifting condition only shifts fees arising from claims covered by the provision. If the claims are covered and the provision includes prevailing party language, then the Court will apply the all-or-nothing approach *to the covered claims*.") (emphasis in original).

his personal assistant were compensated for work Mr. Kakar refused to perform.[247]

But "'[a] claim for unjust enrichment is not available if there is a contract that governs the relationship between the parties that gives rise to the unjust enrichment claim.'"[248] And, indeed, Octo Consulting has pled its unjust enrichment counterclaim as distinct and alternative to its breach-of-contract counterclaims.[249] Because the EA covers all the conduct complained-of here and Octo Consulting is successful on this breach-of-EA counterclaim, Octo Consulting's counterclaim for unjust enrichment fails. Judgment is entered in the Kakar Parties' favor on Superior Court Counterclaim IV.

### I. MR. KAKAR BREACHED THE NCA BY PUBLICLY FILING CONFIDENTIAL INFORMATION IN HIS COMPLAINT, BUT NOT BY CONGRATULATING A LEGACY SEVATEC EMPLOYEE FOR A NEW JOB.

The NCA prevented Mr. Kakar from disclosing Confidential Information, which included Octo Consulting's details of customer or consultant contracts and operational methods.[250] That notwithstanding, Mr. Kakar publicly filed a complaint

---

[247] Octo Br. ¶¶ 99–101.

[248] *Textron Inc. v. Endurance Am. Ins. Co.*, 346 A.3d 639, 653 (Del. Super. Ct. 2025) (quoting *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009)); *see also Everphone, Inc. v. Go Tech. Mgmt., LLC*, 2023 WL 7996560, at *10 (Del. Super. Ct. Nov. 17, 2023); *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, 2013 WL 5210255, at *11 (Del. Super. Ct. Sept. 4, 2013).

[249] *See* Defs./Countercl. Pls.' Reply to Pls.'/Countercl. Defs.' Propsed Findings of Fact and Conclusions of Law ¶ 71 (Super Ct. D.I. 166).

[250] NCA § 2.1.

in this action that revealed such information.[251]  This is a breach of the NCA.  But Octo Consulting hasn't demonstrated to the Court what damages resulted from this breach.

Again, "[e]ven if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages."[252]  Since there has been this specific breach of the NCA, Octo Consulting is entitled to nominal damages therefor.

On the other hand, Octo Consulting has failed to demonstrate that Mr. Kakar breached the NCA by encouraging Corey Ferris to leave Octo Consulting.  There is simply no evidence that Mr. Kakar did encourage Mr. Ferris to leave Octo Consulting.[253]  And Mr. Kakar testified that he didn't know Mr. Ferris planned to leave, he only congratulated Mr. Ferris after Mr. Ferris had already accepted another position.[254]  Sharing congratulatory remarks after an employee has already left isn't encouraging that employee to leave.  And neither the NCA, nor the EA, require Mr. Kakar to actively discourage employees from leaving Octo Consulting.  As a

---

[251] *See* Compl., ¶¶ 65–67 (discussions on potential separation agreement with Mr. Kakar); ¶ 81 (mentioning the CALM project); ¶¶ 26–47 (Octo's acquisition of Sevatec and related agreements).

[252] *Ivize of Milwaukee*, 2009 WL 1111179, at *12 (citing *Palmer*, 2004 WL 397051, at *4).

[253] *See* Singh Tr. 69–72 (no testimony that Mr. Kakar was actively helping Mr. Ferris obtain new employment); *see also* Ferris Tr. at 6–9 (only testifying that Mr. Kakar called him after he accepted a new role with a new company and stating that Mr. Kakar congratulated him on his career move).

[254] 9/8 Kakar Tr. 274–78.

result, Mr. Kakar didn't breach the NCA or EA through his interaction with Mr. Ferris. Judgment is entered in Octo's favor on Superior Court Counterclaim II, but only as to Mr. Kakar's public filing of the complaint without properly safeguarding Confidential Information.

## J. DECLARATORY JUDGMENTS

The parties each seek declaratory judgments pertaining to their continuing rights under their agreements. The Kakar Parties seek a declaration that the Octo Parties have materially breached the agreements, so Mr. Kakar isn't bound by the EA and NCA. For their part, the Octo Parties seek a declaration that Mr. Kakar is still bound by the EA and NCA, and that the Kakar Parties materially breached the SPA.

Again, "'[i]t is a basic tenet of contract law that a party is excused from performance under a contract if the other party is in material breach thereof.'"[255] "'The converse of this principal is that a slight breach by one party, while giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the contract.'"[256]

To quickly recap the breaches: the Octo Parties breached the SPA by failing

---

[255] *Daystar Const. Mgmt., Inc. v. Mitchell*, 2006 WL 2053649, at *7 (Del. Super. Ct. July 12, 2006) (quoting *Word v. Johnson*, 2005 WL 2899684, at *4 (Del. Ch. Oct. 28, 2005)).

[256] *Id.* (quoting *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003), *as revised* (Oct. 6, 2003)).

to pay the agreed purchase price and for failing to release the escrowed funds; Mr. Kakar breached the EA and the NCA; and, the Kakar Parties breached the SPA by failing to pay the Post-Closing Retention Bonuses.

The issue of the enforceability of the EA's and NCA's restrictive covenants is mostly moot since the restrictive period in both agreements has ended. The EA's non-compete and non-solicitation covenants expired December 11, 2022, and are no longer enforceable.[257] And the NCA's restrictive covenants expire on December 11, 2025, and are no longer enforceable as of that date.[258] As well, Octo Consulting didn't breach the EA or NCA, and there is no language in the EA or NCA that provides for a condition precedent for performance. With that, the Court finds it unnecessary to conduct a breach-materiality analysis relating to the EA and NCA. Mr. Kakar is no longer bound by the provisions he resists since they have expired; judgment is entered in his favor on Superior Court Count VI and Counterclaim V.

## K. INTEREST

"In Delaware, prejudgment interest is awarded as a matter of right."[259] "It is not a matter of judicial discretion."[260] The rate will be based on the "legal rate" of

---

[257] EA § 9(a).

[258] NCA § 2.2.

[259] *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992).

[260] *Fortis Advisors, LLC v. Dematic Corp.*, 2023 WL 2967781, at *1 (Del. Super. Ct. Apr. 13, 2023) (citing *Moskowitz v. Mayor and City Council of Wilmington*, 391 A.2d 209, 210 (Del. 1978)).

interest described in 6 *Del. C.* § 2301, since there is no specific interest rate within the Transaction Agreements.[261] "The general rule is that prejudgment interest accrues from the date payment was due to the [successful litigant] because 'full compensation requires an allowance for the detention of the compensation awarded and interest is used as a basis for measuring that allowance.'"[262]

Here, the SPA lays out the dates when certain payments were due. The net working capital amount and Adjustment Escrow were due upon Mr. Kakar's acceptance on April 21, 2021.[263] So the prejudgment interest starts from that date for those amounts. The first $512,500 of the Indemnification Escrow was due on December 11, 2021,[264] and the second $512,500 became due on June 11, 2022.[265] Thus, prejudgment interest accrues on those from those respective dates.

Octo Consulting was due the Post-Closing Retention Bonus Payment on June 11, 2022, 18 months after Closing.[266] Octo Consulting is entitled to prejudgment interest at the legal rate accruing from that date.

---

[261] *See Rollins Envtl. Servs., Inc. v. WSMW Indus., Inc.*, 426 A.2d 1363, 1367 (Del. Super. Ct. 1980).

[262] *Fortis Advisors*, 2023 WL 2967781, at *2 (citing *Moskowitz*, 391 A.2d at 210).

[263] SPA § 1.3(b)(iii).

[264] *Id*. at § 9.11(a).

[265] *Id*.

[266] *Id*. at § 8.6(e).

# VII. CONCLUSION AND VERDICT

For the reasons explained above, the Court enters its verdict and judgments as follows:

## Court of Chancery Action

- Judgment is entered in Octo's favor on Counts II, IV, V, VI, and VII.

## Superior Court Action

- Judgment is entered in the Kakar Parties' favor on Counts IV and VI; and on Counterclaim Counts IV and V.

- Judgment is entered in Octo's favor on Count III; and on Counterclaim Counts I, II, and III.

## Chancery Relief

Octo Platform shall distribute the Reserved Funds from the Chancery action under the terms of the IBM Transaction.

## Superior Court Damages

Octo Consulting shall pay Seva the net working capital amount of $233,535.39 plus properly calculated prejudgment[267] and post-judgment interest at the legal rate. Octo Consulting shall pay Seva the Indemnification Escrow amount of $1.025 million with properly calculated prejudgment and post-judgment interest

---

[267] The Kakar Parties' expert David Rudman calculated the then-to-date prejudgment interest due for these amounts using the correct dates under the SPA's terms and the correct legal rate. PM 9/9 Rudman Tr. 130–37. The Court found Mr. Rudman's calculations to be accurate and credible and suggests them and his methodology as an appropriate starting point for the parties as they compose the proposed final order of judgement.

at the legal rate.  Octo Consulting shall pay Seva the Adjustment Escrow amount of $1.5 million plus properly calculated prejudgment and post-judgment interest at the legal rate.

The Kakar Parties shall pay Octo Consulting the Post-Closing Retention Bonus Payment of $260,000 with prejudgment interest accruing from June 11, 2022, and post judgment interest at the legal rate through the date of payment.

Mr. Kakar shall pay Octo Consulting $2 in damages for Mr. Kakar's breaches of the EA and NCA.  Octo Consulting is also entitled to reasonable attorney's fees and costs arising from litigating the EA counterclaim.  If the parties are unable to agree on an amount, Octo Consulting may move to quantify the fees and costs award.

The final order of judgment entered in these matters shall include a declaration that Mr. Kakar is no longer bound by the EA's and NCA's restrictive covenants.

The parties are instructed to confer and prepare a form of order of final judgment consistent with this decision and submit such on or before April 21, 2026.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*
_____
Paul R. Wallace, Judge